439 F.2d 428
 AMERICAN EUTECTIC WELDING ALLOYS SALES CO., Inc., and Eutectic Corporation, Inc., Plaintiffs-Appellants,
v.
DYTRON ALLOYS CORPORATION, Ralph O. Karsner, Jr. and William N. Price, Defendants-Appellees, and
Kenneth R. Youngblood, Defendant.
 No. 679.
 Docket 35806.
 United States Court of Appeals, Second Circuit.
 Argued January 25, 1971.
 Decided March 18, 1971.
 
 John M. Calimafde, New York City (Sandoe, Hopgood & Calimafde, Paul H. Blaustein, New York City, on the brief), for plaintiffs-appellants.
 Harry Litwin, New York City (Greenwald, Kovner & Goldsmith, New York City, on the brief), for defendant-appellee Dytron Alloys Corp.
 Samuel Newfield, New York City, for defendants-appellees Karsner and Price.
 Before WATERMAN, MOORE and FEINBERG, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 Once again we have the problem of predicting whether the courts of the State of New York would find jurisdiction over non-resident defendants under its "long-arm" statute, N.Y. CPLR § 302 (a). The United States District Court for the Eastern District of New York, Walter Bruchhausen, J., held that they would not, quashing service of process and dismissing an action against defendant Dytron Alloys Corporation (Dytron) and two of its employees, Ralph O. Karsner, Jr., and William N. Price.[1] Plaintiffs American Eutectic Welding Alloys Sales Co., Inc. (American Eutectic) and Eutectic Corporation, Inc. (Eutectic) appeal from that order. For reasons set forth below, we reverse as to the individual defendants and affirm as to the corporate defendant.
 
 I.
 
 2
 American Eutectic is the sales subsidiary of Eutectic; both are New York corporations. Eutectic manufactures metal welding rods and electrode alloys, grossing over $25 million in sales annually. American Eutectic employs over 350 sales personnel throughout the United States, including what the company calls Technical Representatives. The following is alleged in the complaint or supporting affidavits and therefore must be accepted as true for the purpose of this appeal from dismissal of the complaint. The individual defendants received an intensive three-month training course in New York, where plaintiffs' main offices are located. During that period, plaintiffs paid the salaries and living expenses of these defendants, who attended classes, received instruction in metallurgy and plaintiffs' specific welding techniques, and attended laboratory sessions. Each individual defendant signed an employment contract with American Eutectic, which provided that it would become binding upon American Eutectic "only after counter-signature at our Home Office in Flushing, New York * * *. This agreement shall be deemed to be made under, and shall be governed by, the laws of the State of New York in all respects." They were then given various customer control cards, which contained the names of customers and their needs. This information was confidential and the individual defendants promised in the employment contract to keep it so. The contract assigned a particular territory outside of New York to the employee, who agreed that, if his employment ended, he would not work for two years thereafter for a competitor in the same territory. During their period of employment with plaintiffs, which was five and 13 years respectively, the individual defendants had continuous contact with New York by telephone with respect to orders and business problems. In addition, according to the affidavit of Eutectic's vice president, they "may have visited the home offices of the company many times."
 
 
 3
 The two individual defendants left plaintiffs' employ in the recent past and now work for defendant Dytron, a competitor of plaintiffs. Dytron, a Michigan corporation, is based in Detroit, and has sales in a number of states. The theory of the complaint is that Dytron induced plaintiffs' experienced sales employees to leave plaintiffs, come to Dytron, and use confidential information to woo away plaintiffs' customers. The complaint alleges that the two individual defendants are soliciting plaintiffs' customers in Kentucky and Pennsylvania. Dytron is also accused of competing unfairly in other respects. Against all defendants, plaintiffs seek equitable relief, including an injunction against the use or disclosure of the confidential information imparted to the individual defendants.
 
 
 4
 In the district court, defendants moved to quash the service of summons and to dismiss the action for lack of jurisdiction.[2] In support of the motion, the individual defendants allege that they live outside of New York State in the area where they work, that they were served in their state of residence, that they are not assigned any New York State territory, and that they have not been within New York State since beginning employment with Dytron. Their carefully drawn affidavits state that they have not committed any tortious act "within the State of New York," or any act "outside the State of New York that could be deemed to constitute a tortious act causing injury * * * within the State of New York," but do not otherwise deny the wrongdoings alleged. The corporate defendant submitted an affidavit from its president, which similarly emphasizes the jurisdictional facts; e. g., Dytron was served in Michigan; within New York there have been no sales (nor are any planned) and no advertising, although "on rare occasions" Dytron has advertised in one of the three national magazines that serve the welding industry; Dytron has no office, telephone listing, bank account "or any contact of any nature with or within the State of New York."
 
 
 5
 With the case in this posture, the district court granted the motions to quash service of process and to dismiss, holding that the execution of employment contracts in New York was insufficient to bestow jurisdiction and that there was no "substantial contact" with New York justifying invoking its long-arm statute.
 
 II.
 
 6
 Plaintiffs' claim that there is jurisdiction over the individual defendants is based upon New York's long-arm statute, which provides in relevant part, N.Y. CPLR § 302(a) 1:
 
 
 7
 (a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, * * * who in person or through an agent:
 
 
 8
 1. transacts any business within the state * * *.
 
 
 9
 The statute was an attempt to clarify and expand the situations in which the New York courts would take personal jurisdiction over non-resident defendants. See United States v. Montreal Trust Co., 358 F.2d 239, 242 (2d Cir.), cert. denied, 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440 (1966). While the statute has been liberally interpreted, whether jurisdiction exists under section 302(a) 1 can be a close question for the New York Court of Appeals. See McKee Electric Co. v. Rauland-Borg Corp., 20 N.Y.2d 377, 283 N.Y.S.2d 34 (1967) (4-3 decision). A federal court has the added difficulty of predicting what the New York courts would do on particular facts. However, in this case the answer seems fairly clear, at least as to the action against the individual defendants. The key question is whether they "transact[ed] any business within the state" within the meaning of section 302(a) 1, and the New York cases indicate that they did.
 
 
 10
 In Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13, 308 N.Y.S.2d 337, 340, 256 N.E.2d 506, 508 (1970), the New York Court of Appeals unanimously characterized "the situation where a defendant was physically present at the time the contract was made" as "the clearest sort of case in which our courts would have 302 jurisdiction." While it is not absolutely clear from the record before us that the employment contracts were signed by the individual defendants while they were present in New York, that apparently was the case. Indeed, the district judge seems to have made that assumption. Moreover, the evaluation leading up to the handing over of the control cards, the instructions regarding them, and the entire three-month training period for Technical Representatives all took place in New York. These were all "purposeful acts" participated in by the individual defendants "in this State in relation to the contract, albeit preliminary or subsequent to its execution." Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc., 15 N.Y.2d 443, 261 N.Y.S. 2d 8, 18, 209 N.E.2d 68, 75 (1965). Cf. Patrick Ellam, Inc. v. Nieves, 41 Misc. 2d 186, 245 N.Y.S.2d 545 (Sup.Ct. 1963); Iroquois Gas Corp. v. Collins, 42 Misc.2d 632, 248 N.Y.S.2d 494 (Sup.Ct. 1964), aff'd, 23 A.D.2d 823, 258 N.Y.S. 2d 376 (App.Div. 4th Dep't 1965).
 
 
 11
 Indeed, were we disposed to find no jurisdiction over these individual defendants, we would be hard put to distinguish adequately our own opinion in Liquid Carriers Corp. v. American Marine Corp., 375 F.2d 951 (2d Cir. 1967). In that case we relied on the negotiation in New York of a contract with a non-resident corporation in holding that New York had jurisdiction over that corporation in a breach of contract action against it, even though defendant had actually signed the contract in New Orleans and there was no contact at all thereafter between defendant and New York. Obviously, we cannot create binding law for New York, so that if our prior interpretation of New York law were shown to be incorrect, we would not have to follow it. But Parke-Bernet indicates that our approach in Liquid Carriers was sound.
 
 
 12
 The individual defendants quote from eminent authority[3] for the proposition that the mere formal execution of a contract in New York should not be controlling, but that is not our case. The level of activity in New York by these defendants far exceeded the bare execution of employment contracts in New York. Defendants also cite McKee Electric Co. v. Rauland-Borg Corp., supra, and Lamarr v. Klein, 315 N.Y.S. 2d 695 (App.Div. 1st Dep't 1970), a decision relied on by the district court. But in McKee, defendant's agent "spent, in total, less than a full working day in the State in connection with" the disputed contract. 283 N.Y.S.2d at 38 (emphasis in the original). And Lamarr bears only on the plaintiffs' burden of proof, which was met here.
 
 
 13
 We hold that by their conduct the individual defendants transacted business within the meaning of section 302(a) 1. There remains the requirement that plaintiffs' cause of action be one "arising from" that activity, cf. Fontanetta v. American Board of Internal Medicine, 421 F.2d 355 (2d Cir. 1970), but there is little doubt about that. The claims against these defendants are based directly upon the employment contracts and the promises in them to keep certain material confidential and not to compete. We add in a possible excess of caution that we express no view as to the validity of those covenants, questions which have not yet been considered by the trial court.
 
 III.
 
 14
 The alleged basis of jurisdiction over defendant Dytron is another section of the long-arm statute, N.Y. CPLR § 302 (a) 3(ii), which provides for jurisdiction over a non-resident defendant who:
 
 
 15
 3. commits a tortious act without the state causing injury to person or property within the state, * * * if he
 
 
 16
 * * * * * *
 
 
 17
 (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.
 
 
 18
 Thus, under this section, there would be jurisdiction over Dytron in New York if (1) Dytron committed a "tortious act" outside of New York, (2) causing "injury" to plaintiffs "within" New York and, (3) Dytron "expects or should reasonably expect" the tortious act to have consequences in New York; and (4) Dytron "derives substantial revenue from interstate * * * commerce." For purposes of appeal after a dismissal of the complaint, we think that on this record we must assume (1) and (4). But we do not believe that (2) is satisfied.
 
 
 19
 Plaintiffs, both New York corporations, claim that Dytron is, or will be, damaging their business by stealing customers in two states outside of New York, thereby injuring plaintiffs in New York. Without express guidance from the New York Court of Appeals, we must decide whether such damage is, under section 302(a) 3, "injury * * * within the state." Resolution of that issue is complicated by the fact that the alleged tort here is not the type which that section was primarily designed to cover, since the tortious activity and its resulting damage are of a commercial rather than a physical nature.[4] Nevertheless we must locate the situs of injury, albeit only for the purpose of jurisdiction.
 
 
 20
 In Spectacular Promotions, Inc. v. Radio Station WING, 272 F.Supp. 734, 737 (E.D.N.Y.1967), on similar facts Judge Weinstein saw the problem as follows:
 
 
 21
 In determining the situs of an injury resulting from an act of unfair competition for jurisdictional purposes — and here the relevant consideration is fairness of the trial forum — there are three possibilities worth considering: (1) any place where plaintiff does business; (2) the principal place of business of the plaintiff; and (3) the place where plaintiff lost business. For purposes of a jurisdictional statute such as New York's, the first can be rejected almost out of hand; the second has slight merit, and the third seems most apt. Where the plaintiff is a large national corporation, permitting it to sue in any of the fifty states in which it does business would obviously be unfair to the defendant. The main place of business of the plaintiff would have no predictable relationship with the tortious activities of the defendant. The place where the plaintiff lost business would normally be a forum reasonably foreseeable by a tortfeasor and it would usually be the place where the critical events associated with the dispute took place.
 
 
 22
 Under that analysis, there would be no jurisdiction over Dytron here because the places where plaintiffs "lost business" were all out of New York.[5]
 
 
 23
 Of course, there is no question that plaintiffs suffered some harm in New York in the sense that any sale lost anywhere in the United States affects their profits. But that sort of derivative commercial injury in the state is only the result of plaintiffs' domicile here. In Friedr. Zoellner (New York) Corp. v. Tex Metals Co., 396 F.2d 300, 303 (2d Cir. 1968), we stated:
 
 
 24
 Zoellner lost its scrap metal in New Orleans. The process of reasoning by which Zoellner seeks to convert this New Orleans injury into an injury within New York defies restatement. However, even if it is assumed that some injury in New York flowed from the New Orleans injury, jurisdiction would be lacking. Section 302(a) (3) is not satisfied by remote or consequential injuries which occur in New York only because the plaintiff is domiciled, incorporated or doing business in the state. See Black v. Oberle Rentals, Inc., 55 Misc.2d 398, 285 N.Y.S.2d 226 (1967). Oberle Rentals, cited by the court, involved an accident to New York domiciled plaintiffs, allegedly caused by defects in part of a trailer unit manufactured by the third-party defendant, an out-of-state corporation not doing business in New York. Although the accident occurred in Massachusetts, the "injury to person or property within" New York was alleged to be "permanent visible injuries [and] permanent loss of income." The court held that such "injury" did not confer jurisdiction under the statute:
 
 
 25
 Certainly every person injured in an accident has resultant damage as well as the personal injury. He may suffer lost earnings, diminution of earning capacity, long periods of convalescence and all such attendant damages. Conceptually it is difficult for this Court to hold that a personal or property injury in another state by virtue of a tortious act committed in that state can be said to have suffered some injury within the State of New York simply because he is domiciled here. In other words, Section 302(a) (3) CPLR looks to the imparting of the original injury within the State of New York and not resultant damage, in order that jurisdiction might be effectuated. To hold otherwise would open a veritable Pandora's Box of litigation subjecting every conceivable prospective defendant involved in an accident with a New York domiciliary to defend actions brought against them in the State of New York. This is hardly the minimal contact with the State prerequisite to the exercise of its power over a prospective defendant.
 
 
 26
 285 N.Y.S.2d at 229. While the tort in Oberle Rentals was noncommercial and involved physical impact that occurred in Massachusetts, the court did cite Spectacular Promotions and characterized its "rationale" as "cogent." Id.
 
 
 27
 In arguing for jurisdiction here, plaintiffs cite Path Instruments International Corp. v. Asahi Optical Co., 312 F.Supp. 805 (S.D.N.Y.1970), and General Motors Acceptance Corp. v. Richardson, 59 Misc. 2d 744, 300 N.Y.S.2d 757 (Sup.Ct.1969). While not indicating an opinion on the merits of Path Instruments, we note that neither decision focussed on the precise issue before us, i. e., whether there was "injury" for jurisdictional purposes "within the state." In General Motors Acceptance Corp., a Pennsylvania auctioneer sold an automobile in which plaintiff corporation had a security interest, and the court apparently assumed that conversion of the vehicle in Pennsylvania caused injury for jurisdictional purposes to the plaintiff in New York merely because it was domiciled or doing business here. In criticism of that decision, it has been pointed out that such an assumption would be
 
 
 28
 that if the plaintiff is in New York when the injury occurs, the injury must occur in this state. The potential of so sweeping a doctrine is enormous, and it is suggested, in many cases would violate due process.
 
 
 29
 J. McLaughlin, Supplementary Practice Commentary, CPLR § 302, at 123 (McKinney Supp.1970).
 
 
 30
 Plaintiffs, however, contend that no similar assumption need be made here because Dytron must have expected its tortious acts to have consequences in New York. But this misses the point. We are concerned with whether there was "injury" within New York not with whether the corporate defendant could have "reasonabl[y] expect[ed] the act to have consequences" here. It is true that the foreseeability requirement in this respect cuts down the scope of the statute, but we do not reach it unless we first conclude that there was injury in New York. As to that, plaintiffs may be arguing that a loss of profits in plaintiffs' home office must be a "consequence," and that "injury" caused by a tortious act and "consequences" of that act are identical. Ordinarily the second proposition would be accurate, but we are not sure that it must always be so. E. g., in Oberle Rentals, supra, it may be that there were "consequences" in New York although legal "injury" clearly occurred in Massachusetts. Similarly, it may be that there were financial "consequences" to plaintiffs here in New York, although the legal "injury" occurred elsewhere. We mention such possibilities not to so decide or even to indicate a view, but to emphasize that the precise issue before us is whether Dytron's acts caused "injury" to plaintiffs "within" New York. A finding that it did would at least raise a serious constitutional question whether "the twin tests of fairness-reasonableness to the defendant on the one side and territorial respect for sister states' due spheres on the other"[6] were met. The former test was the focus of the quotation above from Spectacular Promotions and the latter, in view of Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), can hardly be completely disregarded. It is clear, in any event, that the legislature did not intend to extend the jurisdiction of the New York courts to the outer reaches of constitutional power.[7] This legislative restraint sheds some light on whether "injury * * * within the state" should be interpreted to press judicial jurisdiction to its fullest limits.
 
 
 31
 Based upon the limited guidance available to us, we believe that the New York courts would refuse to sustain jurisdiction over Dytron on these facts under section 302(a) 3(ii). Perhaps the case would be different if the discernible local impact of the commercial injury to plaintiffs were greater, e. g., destruction of plaintiffs' business in New York by the loss of out-of-state customers, although we express no view as to that. But the injury here does not even approach that extreme. Accordingly we hold that Dytron's alleged tortious activity in Kentucky and Pennsylvania did not cause plaintiffs "injury * * * within the state," and we affirm dismissal of the complaint against Dytron.
 
 
 32
 In affirming as to Dytron but reversing as to the individual defendants, we recognize that we reach apparently inconsistent results. However, the relevant activities of the corporate and individual defendants were simply not the same. The difference in result flows directly from that. We agree that it makes little sense as a practical matter to have the suit against the individual defendants in New York and the suit against the corporate defendant elsewhere, but we cannot solve plaintiffs' tactical problems by making exceptions to what we believe the New York courts would regard as proper jurisdictional principles. However, if plaintiffs commence suit against Dytron in another jurisdiction, a possible solution might be to seek to transfer the New York action against the individual defendants under 28 U.S.C. § 1404(a).
 
 
 33
 Affirmed in part and reversed in part.
 
 
 
 Notes:
 
 
 [1]
 Plaintiffs also sued a third defendant, Kenneth R. Youngblood, who took no action in the district court. There was no dismissal as to him
 
 
 [2]
 Plaintiffs moved for summary judgment or a preliminary injunction and for leave to take depositions
 
 
 [3]
 J. McLaughlin, Supplementary Practice Commentary, CPLR § 302, at 137 (McKinney Supp.1970); 1 J. Weinstein, H. Korn & A. Miller, New York Civil Practice § 302.060, at 3-70 (1970)
 
 
 [4]
 In 1966, the New York legislature amended § 302 in response to the interpretation given § 302(a)2 by the New York Court of Appeals in Feathers v. McLucas, 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965). InFeathers, plaintiff alleged that an out-of-state defendant had negligently constructed a propane gas tank in Kansas, which exploded in New York. The court denied jurisdiction, holding that defendant had not "commit[ted] a tortious act within the state" under § 302(a)2, and that the section could not be judicially construed to mean "commits a tortious act without the state which causes injury within the state." Id. at 21 (emphasis in the original). See Memorandum of the Judicial Conference on Ch. 590, Laws of 1966; Reese, "A Study of CPLR 302 in Light of Recent Judicial Decisions," in N. Y. Judicial Conference, Eleventh Annual Report 132 (1966); General Motors Acceptance Corp. v. Richardson, 59 Misc. 2d 744, 300 N.Y.S.2d 757, 762 (Sup.Ct. 1969).
 
 
 [5]
 Cf. the court's further observation inSpectacular Promotions, supra, 272 F. Supp. at 737:
 Choice of law rules for conflicts purposes offers a weak analogy. The place of injury is only one of the contacts considered in choosing the law to be applied in tort actions. See American Law Institute, Restatement of the Law, Second, Conflict of Laws, § 379(2) (a) (Tentative Draft No. 9, 1964). In unfair competition actions the choice has been made on the basis of "place of the wrong" defined as the place "where the last event necessary to make an actor liable takes place." Vanity Fair Mills, [Inc.] v. T. Eaton Co., 234 F.2d 633, 639 (2d Cir. 1956) * * *. Cf. Shoppers Fair of Arkansas, Inc. v. Sanders Company, 207 F.Supp. 718, 725 (W.D.Ark.1962) (place where customers deceived). See Restatement, Conflict of Laws, § 377.
 
 
 [6]
 Rosenberg, "Proposed Direct Action Statute," in N.Y. Judicial Conference, Sixteenth Annual Report 264, 265 (1971)
 
 
 [7]
 New York Judicial Conference, Report to the 1966 Legislature in Relation to the Civil Practice Law and Rules 12-24 (1966)